UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
RHEA BREITBARD, pro se,

                Plaintiff,

        -against-

DETECTIVE CAMERON MITCHELL,
DETECTIVE KELLEY MEADE, DETECTIVE
FALLACARO, and R. VORA, MD,

                Defendants.
-----------------------------------------------------------x

**MEMORANDUM AND ORDER**

02-CV-1257 (DLI)(LB)

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff, proceeding pro se, alleges false arrest, malicious prosecution, and violation of her Fourth Amendment protection against unreasonable seizure pursuant to 42 U.S.C. § 1983. These claims stem from plaintiff's February 19, 2001 arrest by defendant Detectives Mitchell and Meade. In addition, plaintiff alleges that she was never arraigned following her arrest and that this constituted a violation of Due Process under the Fourteenth Amendment. Plaintiff's amended complaint further contains vague allegations against defendant Detective Fallacaro for failing to pursue plaintiff's complaint regarding the alleged false arrest, which she filed with the Internal Affairs Bureau of the New York City Police Department on March 28, 2001. All defendants have moved for summary judgment.

In an affidavit opposing defendants' motion, plaintiff has voluntarily dismissed all claims against defendant Dr. Vora, who is accordingly terminated from this case. For the following reasons, defendants' motion for summary judgment is granted as to plaintiff's claims of false arrest, malicious prosecution, and violation of due process and the claim against Detective Fallacaro. Summary judgment is denied as to the claim of unreasonable seizure, and defendant Detectives Mitchell and

Meade are denied qualified immunity as to this claim.

**I. Facts**

Plaintiff was an employee of Bernard Harrigan for eight years. In December 2000, Harrigan fired plaintiff for lateness, poor performance, and other erratic behavior. Shortly after being fired, plaintiff made several phone calls to her former employer. Plaintiff admits to making at least three such calls but claims that they were made in order to find out the telephone number of Harrigan's accountant for income tax purposes. Harrigan claims that plaintiff made six calls to him, both at home and at work. Furthermore, Harrigan claims that these calls were threatening and that during the course of these calls, plaintiff said that she "was going to get his children" and called them "the spawn of the devil." (Defs.' Mem. at 2.)

On January 28, 2001, Harrigan filed a complaint with the police at the 61st Precinct in Brooklyn stating that plaintiff was repeatedly calling his home and harassing him and his family. On February 19, 2001, defendants Detective Cameron Mitchell and Detective Kelley Meade went to plaintiff's home, also in Brooklyn. Plaintiff claims that Detectives Mitchell and Meade were accompanied by another detective and two uniformed officers. Plaintiff states the detectives and officers identified themselves as "the police" and yelled at her to open the door. Plaintiff then asked the officers whether they had a warrant, to which the detectives responded that they did, and plaintiff opened the door. Plaintiff asserts that she told the detectives not to cross the threshold into her apartment. Plaintiff then turned her back on the detectives, with the door still open, in order to retrieve her glasses so that she could read the warrant, which the detectives had not yet shown her. When plaintiff turned back around, the detectives had entered her apartment and were standing near

2

the entranceway. No arrest warrant was produced for plaintiff's inspection, and neither party now contends that such a warrant actually existed. The detectives arrested plaintiff, handcuffed her, placed her in an unmarked car, and drove her to the 61st Precinct. Plaintiff asserts that the detectives refused to tell her why she was being arrested until they arrived at the precinct.

Upon arriving at the precinct, plaintiff was charged with harassment in the second degree (N.Y. PENAL LAW § 240.26(1)), a violation, and aggravated harassment in the second degree (N.Y. PENAL LAW § 240.30 (1), (2)), a class A misdemeanor. Several hours after plaintiff's arrest, Harrigan signed an affidavit in support of the criminal complaint issued by the King's County District Attorney's Office. This complaint, although more detailed, contained the same basic allegations as the complaint Harrigan filed on January 28, 2001.

After her arrest was processed, plaintiff was photographed, but the parties dispute whether or not she was fingerprinted. Plaintiff also contends that the police at the precinct took her personal property without giving her a voucher. Plaintiff was then placed in a holding cell whereupon she proceeded to remove all of her clothing. Upon seeing this behavior, the police notified Emergency Medical Services ("EMS") and informed them that plaintiff was an emotionally disturbed person ("EDP"). The EMS technician noted that plaintiff was combative and verbally abusive and concluded that she required hospitalization. The technician's report also stated that plaintiff had declared that she wanted to die. Plaintiff was then transported to Coney Island Hospital, arriving at approximately 11:00 p.m., where she was evaluated for psychiatric admission and diagnosed as having bi-polar disorder.

Plaintiff was subsequently evaluated by defendant Dr. Vora at approximately 1:00 a.m. on February 20, 2001. During this evaluation, plaintiff stated that she was depressed and suicidal. She

reported experiencing paranoid delusions, including thoughts that she was possessed by the devil. Dr. Vora concluded that plaintiff was a danger to herself and others and that she needed medication, as well as further inpatient psychiatric evaluation and care. After this evaluation, plaintiff was returned to Central Booking for arraignment.

The events surrounding plaintiff's arraignment, or alleged lack thereof, are largely in dispute. According to defendants, plaintiff was arraigned on February 20, 2001, as shown on a document entitled "Chronological Record of Case" attached to their motion as Exhibit K. This document lists plaintiff's arraignment number as "K01017158" and contains a record for a court appearance on February 20, 2001. In the space indicated for the name of the presiding judge, the letters "karop" or "korop" appear to be written. Additionally, a handwritten notation on the form reads: "Defendant RORd [released on own recognizance] + released to custody of Coney Island Hospital for psych evaluation." The document also lists the numbers 240.26(1), 240.30(1), and 240.30(2), which correspond to the New York Penal Law sections under which plaintiff was charged. (Defs.' Ex. K.)

Defendants also contend that an Order of Protection was issued at plaintiff's arraignment, ordering her to stay away and refrain from contacting or otherwise harassing Bernard Harrigan. This order, issued by the Criminal Court of the City of New York, Kings County, dated February 20, 2001, was to remain in effect until March 6, 2001. (Defs.' Ex. L.) A box is checked on the Order of Protection, stating "Defendant advised in Court of issuance of Order." However, directly below that box there is a caption reading "Received by:" and a space indicated for "Defendant's Signature," which was never signed. (*Id.*) On the upper right-hand side of the form there are two boxes, the first captioned "Ex Parte," and the second, "Defendant Present in Court." Underneath the boxes is written in parentheses "check one," although neither box is checked. (*Id.*) Furthermore, no official

court seal can be seen on the document despite the fact that a space is indicated for such seal. However, the order is signed with the initials "M.K." and the name "Karopkin" appears to be written on the top of the page, indicating, along with the notation on the "Chronological Record of Case," that Judge Martin G. Karopkin presided over the arraignment and issued the Order of Protection.

Plaintiff contends that she was never arraigned and that, upon returning to Central Booking, she met with an attorney named Alan Rosenberg from the Brooklyn Defender's office, who told her that her case had been dismissed. Plaintiff contends she asked for her case to be placed back on the calendar, to which Mr. Rosenberg responded by writing some information on a business card, handing it to plaintiff, and informing her that her case was back on the calendar for March 6, 2001. Plaintiff denies ever being in court, standing before a judge, being read charges, entering a plea, receiving a copy of the protective order, or being released on her own recognizance.

At 9:30 p.m. on February 20, 2001, a new doctor at Coney Island Hospital saw plaintiff for a second evaluation. This doctor concluded that, because of plaintiff's delusions and purposeless hyperactivity, she required further hospitalization. The doctor also took note of plaintiff's prior history of mental illness.[1] On February 21, 2000, at approximately 5:06 p.m., plaintiff was transferred by ambulance from Coney Island Hospital to Gracie Square Hospital, a private psychiatric hospital, where she arrived at approximately 6:07 p.m. Gracie Square Hospital did not release plaintiff from its care until March 23, 2001.

On March 28, 2001, plaintiff filed a complaint about her arrest with defendant Fallacaro, a

---

[1] The doctor's report noted plaintiff's previous hospitalization at Gracie Square Hospital from December 10, 2000 through January 3, 2001, as well as at the Long Island Medical Center on January 6, 2001 for temporary psychiatric observation. Plaintiff was also hospitalized for psychiatric care in Pittsburgh in 1978.

5

detective with the Internal Affairs Bureau of the New York City Police Department. Detective Fallacaro took plaintiff's statement, but plaintiff was never contacted regarding the status of the investigation into her complaint. On August 7, 2001, plaintiff accepted an Adjournment in Contemplation of Dismissal ("ACD") for the harassment charges that had led to her February 19, 2001 arrest. Another Order of Protection, which remained in effect until February 6, 2002, was also issued on this date. Both Orders of Protection issued against plaintiff were initialed by the presiding judges (Judge Karopkin on February 20, 2001 and Judge Camacho on August 7, 2001). However, the August 7, 2001 order, unlike the February 20, 2001 order, contains a checked box indicating that plaintiff was present in court and bears her signature as well as the seal of the court. (Pl.'s Ex. K.)

Defendants submit an unofficial "Certification of Disposition" from Criminal Court of the City of New York, Kings County, signed July 8, 2004. (Defs.' Ex. P.) This certification shows the arraignment charges for the appropriate New York Penal Law sections and states that plaintiff's case was adjourned on August 7, 2001 in front of Judge Camacho and dismissed on February 6, 2002 by Judge William Miller. (*Id.*) While plaintiff contends that she did not understand or agree to an ACD, she does not dispute that the Certification of Disposition accurately reflects how the charges against her were terminated.

## II. Summary Judgment

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). When ruling on a motion, the court must view any disputed information in

the light most favorable to the nonmoving party. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 457, 112 S. Ct. 2072, 2076–77, 119 L. Ed. 2d 265 (1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986)). Summary judgment is inappropriate if any there is "any evidence in the record from any source from which a *reasonable* inference could be drawn in favor of the nonmoving party" regarding a genuine issue of material fact. *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir. 2000) (emphasis added). However, the nonmoving party cannot rely on "[c]onclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), and must affirmatively "set forth specific facts showing that there is a genuine issue for trial," FED. R. CIV. P. 56(e). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)).

**III. Pro Se Litigants**

As a background principle, it must be noted that plaintiff is proceeding pro se in this case. As a result, the court is "obliged to construe [her] pleadings liberally, particularly when they allege civil rights violations." *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004) (citing *Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001)).

**IV. Section 1983 Claims**

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979). Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983. For claims under § 1983, plaintiff must prove "that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999).

**1. False Arrest**

Plaintiff alleges false arrest under 42 U.S.C. § 1983 and state common law. A finding of liability for false arrest under New York law also gives rise to liability under § 1983. *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003). To state a claim for false arrest under New York law, a plaintiff must show that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Id.* (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). Only element (4) is at issue here. A confinement is "privileged" or "justified" if

there was probable cause to believe that the arrestee committed the crime for which he or she was arrested. *Savino*, 331 F.3d at 76 (citing *Broughton v. State*, 37 N.Y.2d 451, 458 (1975)). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal quotation marks and citations omitted).

Probable cause for an arrest exists when an officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Savino*, 331 F.3d at 76 (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)). A crime victim's unequivocal identification of a suspect in a police complaint provides probable cause for an arrest, so long as the arresting officer's belief in the complaint's allegations was reasonable. *Bernard*, 25 F.3d at 103 (citing *Colon v. City of New York*, 468 N.Y.S. 2d 453, 455–56 (1983)); *Carson v. Lewis* 35 F. Supp. 2d 250, 259–60 (E.D.N.Y. 1999).

Defendant Detectives Mitchell and Meade arrested plaintiff in response to Bernard Harrigan's January 28, 2001 complaint. This complaint alleged that plaintiff, Harrigan's recently fired employee, had been repeatedly calling and harassing Mr. Harrigan and his wife in violation of New York Penal Law. These allegations, if true, were sufficient to justify plaintiff's arrest. Defendants had no reason to doubt Mr. Harrigan and cannot be faulted for believing his allegations and acting on them. "It would be unwise for the courts to engage in a hind-sight review to decide whether a police officer should have credited the story of a person who was willing to swear that [he] was the victim of a crime." *Garofalo v. City of New York*, 1996 WL 94806, at *2 (S.D.N.Y.). It is certainly reasonable to believe that a disgruntled ex-employee might make harassing phone calls to her former employer. Mr. Harrigan's complaint of January 28, 2001 made allegations that were sufficient to

9

provide probable cause for plaintiff's February 19, 2001 arrest. Thus, defendants' motion for summary judgment is granted with respect to plaintiff's claim of false arrest.

**2. Malicious Prosecution**

As with claims for false arrest, § 1983 claims for malicious prosecution are governed by state law. *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003); *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995). A malicious prosecution claim under New York law requires a plaintiff to prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Jocks*, 316 F.3d at 136 (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)); *Russell*, 68 F.3d at 36.

Defendants correctly assert that probable cause existed for commencing criminal proceedings against the plaintiff. "In the context of a malicious prosecution claim, probable cause under New York law is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994) (quoting *Pandolfo v. U.A. Cable Sys. of Watertown*, 568 N.Y.S. 2d 981, 982 (4th Dep't 1991)) (quotation marks omitted). As explained above, Bernard Harrigan's January 28, 2001 police complaint provided probable cause for plaintiff's arrest. This complaint, the February 19, 2001 criminal complaint issued by the King's County District Attorney's Office, and Mr. Harrigan's supporting affidavit provided apparent facts that would justify a reasonable person in believing that there were lawful grounds for prosecuting

plaintiff. Plaintiff fails to set forth any specific facts to controvert this conclusion. Since plaintiff must prove all four elements in order to prevail on a claim of malicious prosecution, the presence of probable cause alone is sufficient to justify granting defendants' motion for summary judgment on that claim.

Plaintiff's malicious prosecution claim fails for another reason as well. In order to prevail, plaintiff would have to prove that the criminal proceeding against her was terminated in her favor. "In the absence of a decision on the merits, the plaintiff must show that the final disposition is indicative of innocence." *Russell*, 68 F.3d at 36. Plaintiff does not contest that the proceedings against her were terminated by an ACD issued on August 7, 2001. An ACD, which is a conditional dismissal that becomes final if the accused meets certain criteria within a six-month period,[2] is not considered to be a favorable termination indicative of innocence. *Shain v. Ellison*, 273 F.3d 56, 68 (2d Cir. 2001); *Murphy*, 188 F.3d at 948–49. Thus, defendants' motion for summary judgment is granted with respect to plaintiff's claim of malicious prosecution.

### 3. Violation of Due Process

Plaintiff alleges that she was deprived of liberty without due process of law in violation of the Fourteenth Amendment because she was never arraigned on February 20, 2001. (Pl.'s Opp'n at 6.) Defendants have attached to their motion a "Chronological Record of Case," as Exhibit K, and an "Order of Protection" as Exhibit L. These documents show that plaintiff was in court on February 20, 2001, that plaintiff was arraigned on harassment charges, and that an Order of Protection was

---

[2] N.Y. CRIM. PROC. LAW § 170.55.

issued against plaintiff. These documents are dated and indicate that Judge Martin G. Karopkin presided over the arraignment and issued the Order of Protection. While there is no official court seal on the documents and there appear to be some other minor technical deficiencies, the Order of Protection bears Judge Karopkin's initials, and the documents establish plaintiff was in court on February 20, 2001. Plaintiff puts forth no evidence, outside of her own assertions, to contradict this evidence or suggest that she was not arraigned in court on the date in question. Defendants' motion for summary judgment is granted with respect to plaintiff's due process claim.

**4. Unreasonable Seizure**

Plaintiff claims that her arrest by defendant Detectives Mitchell and Meade on February 19, 2001 constituted an unreasonable seizure in violation of the Fourth Amendment. It is undisputed that plaintiff was arrested without a warrant on misdemeanor and violation charges inside her own home. It is well established that "police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home." *Loria v. Gorman*, 306 F.3d 1271, 1283 (2d Cir. 2002) (quoting *Kirk v. Louisiana*, 536 U.S. 635, 122 S. Ct. 2458, 2459, 153 L. Ed. 2d 599 (2002) (per curiam)). It is also beyond dispute that an individual's expectation of privacy is at its apex when "bounded by the unambiguous physical dimensions of [his or her] home." *Payton v. New York*, 445 U.S. 573, 589, 100 S. Ct. 1371, 1381–82, 63 L. Ed. 2d 639 (1980). In *Payton*, the Court stated that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id*. at 590. While "seizures inside a home without a warrant are presumptively unreasonable," *id*. at 586 n.24,

"warrantless arrests in public places are valid," *id*. at 587.

Defendants contend that, because plaintiff voluntarily opened her door in response to the police, and because the arrest was made just within the doorway of plaintiff's home without the use of force, plaintiff had surrendered her expectation of privacy and there was no constitutional violation. Defendants primarily justify this contention by relying on the line of cases that began with *United States v. Santana*. 427 U.S. 38, 96 S. Ct. 2406, 49 L. Ed. 2d. 300 (1976). In *Santana*, police observed a suspected heroin dealer standing in the doorway of her home. When the officers identified themselves, the suspect retreated into her house without closing her door. The police officers, acting without a warrant, followed the suspect through the open doorway and placed her under arrest. *Id*. at 40–41. The Court held the arrest constitutional and found that the suspect's Fourth Amendment rights had not been violated because she had knowingly exposed herself to the public by standing in her open doorway and, therefore, retained no expectation of privacy. *Id*. at 42. The Court held that the suspect could not defeat the otherwise lawful arrest by retreating into her home, as the retreat created a "hot pursuit" situation. *Id*. at 42–43. Hot pursuit was found even though the "pursuit . . . ended almost as soon as it began," because, once the suspect spotted the police, "there was a realistic expectation that any delay would result in destruction of evidence." *Id*. at 43.

Defendants also rely on *United States v. Gori*, a case in which the police, acting without a warrant, ordered suspected cocaine dealers out into the hallway after the door to the suspects' apartment had been voluntarily opened in response to the knock of an invitee.[3] 230 F.3d 44, 47 (2d

---

[3] The suspects had ordered food delivered to their apartment and opened the door in response to the delivery person. The police, after being spotted by the delivery person, made the decision to

13

Cir. 2000). After a consensual search of the apartment revealed cocaine and large sums of money, the suspects were arrested. *Id*. at 48. The Second Circuit found the officers' actions to be reasonable, and therefore constitutional, in light of the rapidly developing situation and the "exigencies of the moment." *Id*. at 55.

The Second Circuit has generally found *Santana*'s reasoning inapplicable when the arrestee attempts to stay within his or her home. *See Loria*, 306 F.3d at 1286 (police officer acted unconstitutionally by preventing suspect from closing door, taking two steps inside, and seizing suspect to make the arrest); *United States v. Reed*, 572 F.2d 412, 423 (2d Cir. 1978) (federal agents acted unconstitutionally by arresting suspect within her house, because, even though suspect had opened door to agents, she had not crossed the threshold or otherwise exposed herself to public view as if outside). The issue of whether a suspect who opens his or her door in response to a police officer's knock surrenders his or her privacy interest and may be arrested without a warrant, absent exigent circumstances, is in great dispute among the federal courts.[4] Nevertheless, the guidelines

---

follow her to the suspects' door in order to protect her and prevent her from revealing their presence.

[4] Some courts have decided, *Santana* and its progeny notwithstanding, that the privacy interest established in *Payton* remains even if a suspect voluntarily open his or her door in response to a police officer's knock. *See United States v. Berkowitz*, 927 F.2d 1376, 1387 (7th Cir. 1991) ("person does not abandon this privacy interest in his home by opening his door from within to answer a knock"); *United States v. McCraw*, 920 F.2d 224, 228 (4th Cir. 1990) ("person does not surrender his expectation of privacy nor consent to the officers' entry" where officers forced open hotel room door after occupant partially opened door to see who had knocked). In a similar vein, in *Duncan v. Storie*, when the Eighth Circuit was confronted by a situation akin to that presented in *Loria*, it reasoned that a man who voluntarily opened his door to speak with a police officer, but remained within his house, did not surrender his privacy interest when he tried to close his door and retreat into his home upon learning the officer's intentions to arrest him. 869 F.2d 1100, 1103 (8th Cir. 1989). However, courts in other circuits have interpreted *Santana* to cover the "knock and arrest" situation even when the arrest occurred behind the threshold of the doorway. *See, e.g.*, *McKinnon v. Carr*, 103 F.3d 934 (10th Cir. 1996); *United States v. Vaneaton*, 49 F.3d 1423 (9th Cir. 1995).

laid down by the Second Circuit in *Loria* and *Reed* inform our jurisprudence. It cannot be said as a matter of law that plaintiff abandoned her privacy interest simply by opening the door to her home in response to the defendants' knock.

Furthermore, plaintiff only opened her door after the police officers announced their presence and falsely informed her that they had a warrant. Though "the law permits police to pressure and cajole, conceal material facts, and actively mislead, it draws the line at outright fraud." *Hadley v. Williams*, 368 F.3d 747, 749 (7th Cir. 2004) (quoting *United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990)). As in *Hadley*, plaintiff's "consent was conditioned on the police having a warrant," which they did not. 368 F.3d at 749. Plaintiff's consent "was procured by an outright and material lie, and was therefore ineffectual." *Id*. Defendants' deceitful tactics prevent them from now being able to assert that plaintiff willingly abandoned her privacy interest by opening her door.

As plaintiff was arrested in her home and did not surrender her privacy interest, plaintiff's warrantless arrest, to be valid, must have been made under exigent circumstances. *See Loria*, 306 F.3d at 1283. The present case is distinguished from *Santana* and *Gori* by the absence of any exigent circumstances necessitating plaintiff's warrantless arrest. The arrest in *Santana* was justified, in part, by the officers' need to pursue the suspect in order to prevent her from destroying evidence. 427 U.S. at 43. Similarly, in *Gori*, the officers' need to instantly respond to a rapidly developing situation played a pivotal role. 239 F.3d at 57. *Payton,* at the very least, established that officers may not, absent exigent circumstances or consent, enter a suspect's home to make a warrantless arrest. 445 U.S. at 590. Numerous factors may be taken into account when determining whether exigent circumstances existed, but "[t]he essential question . . . is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." *Loria*, 306 F.3d at 1284 (quoting

15

*United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990)). Defendants, by responding to a three week old misdemeanor harassment complaint, did not confront any such need regarding plaintiff's arrest, nor do they now contend that such a need existed.

The minor charges against plaintiff highlight the absence of exigent circumstances surrounding her arrest. These charges were for non-violent misdemeanor and violation offenses that were complained of weeks before plaintiff's February 19, 2001 arrest. "When the government's interest is only to arrest for a minor offense, [the] presumption of unreasonableness [of the officers' actions] is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate." *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S. Ct. 2091, 2098, 80 L. Ed. 2d 732 (1984). An officer's failure to obtain a warrant where the individual has committed a minor offense and there are no exigent circumstances "displays a shocking lack of all sense of proportion." *Id.* at 751 (quoting *McDonald v. United States*, 335 U.S. 451, 459, 69 S. Ct. 191, 195, 93 L. Ed. 153 (1948)).

While it may be argued that plaintiff's harassing phone calls threatened violence, the police apparently did not view the possibility of violence as a legitimate concern, as they waited for more than three weeks from the time when Mr. Harrigan filed his complaint on January 28, 2001 to the time when defendants arrested plaintiff on February 19, 2001. Defendants offer no justification as to why they were unable to obtain a warrant during this time before proceeding with plaintiff's arrest. Since defendants proffer no evidence indicating that exigent circumstance were present, a rational jury might find that defendants' warrantless arrest of plaintiff inside of her own home violated her rights under the Fourth Amendment. Defendants' motion for summary judgment is thus denied with respect to plaintiff's Fourth Amendment claim.

## V. Qualified Immunity

Defendants contend that they are entitled to qualified immunity on all of plaintiff's claims. A civil suit for damages is often the only form of redress available to those who feel that their rights have been violated because of a public official's abuse of power. *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S. Ct. 2727, 2736, 73 L. Ed. 2d 396 (1982)). Qualified immunity strives to strike a balance between "the need to provide a means for the vindication of constitutional guarantees and the societal costs that inhere in litigation against public officials, including the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible [public officials] in the unflinching discharge of their duties." *Loria*, 306 F.3d at 1281 (quoting *Harlow*, 457 U.S. at 814) (internal quotation marks omitted).

Qualified immunity attempts to reconcile these conflicting interests by providing government officials performing discretionary functions with immunity from civil suits, so long as their actions "could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson*, 483 U.S. at 638. In other words, qualified immunity protects officers whose belief in the lawfulness of their actions was objectively reasonable. *Loria*, 306 F.3d at 1282. "[It] is more than a simple defense—it is an entitlement not to stand trial or face the other burdens of litigation . . . an *immunity from suit* rather than a mere defense to liability." *Id*. at 1281 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815, 86 L. Ed. 2d 411 (1985)) (internal quotation marks omitted). Since plaintiff's Fourth Amendment claim is, on its merits, the only claim asserted that can withstand defendants' motion for summary judgment, it is the only one that needs to be considered for the purposes of qualified immunity.

Determining whether an official is entitled to qualified immunity requires a two part analysis. The first question that must be asked is whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201,121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Such a right must be a clearly established constitutional right and "the relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Loria*, 306 F.3d at 1281.

Under the circumstances, no officer could have reasonably concluded that it was lawful to lie to plaintiff in order to gain entry into her house—without a warrant or her consent and absent exigent circumstances—and arrest her under these facts for a minor offense. The contours of plaintiff's Fourth Amendment right to be free from unreasonable seizures is sufficiently clear that defendants should have known that their actions in arresting plaintiff violated that right. *See Saucier*, 533 U.S. at 202. Thus, defendants are not entitled to qualified immunity and their motion for summary judgment is denied with respect to that claim.

## VI. Claim Against Detective Fallacaro

Even when considering plaintiff's allegations favorably in light of her pro se status, plaintiff fails to state a claim, constitutional or otherwise, against defendant Detective Fallacaro. All plaintiff alleges is that Detective Fallacaro's "job is to investigate wrongdoing by police officers, she never followed through on this investigation or bothered to correct the [Bureau of Internal Affairs] log number." (Pl.'s Mem. at 13.) Defendants correctly note that there is "[n]o right, privilege, or

immunity guaranteed by the Constitution or the laws of the United States [that] is implicated by a civilian complaint to a police department." *Johnson v. Police Officer #17969*, 2000 WL 1877090, at *6 (S.D.N.Y.). At most plaintiff alleges that Detective Fallacaro performed her job poorly. As plaintiff provides no evidence that would support a claim against Detective Fallacaro, defendants' motion for summary judgment is granted with respect to that claim.

**VII. Conclusion**

For the reasons above, defendants' motion for summary judgement is granted as to the claims of false arrest, malicious prosecution, and violation of due process and the claim against Detective Fallacaro. Summary judgment is denied as to the claim of unreasonable seizure, and defendant Detectives Mitchell and Meade are denied qualified immunity as to this claim.

SO ORDERED.

DATED:   Brooklyn, New York
         September 14, 2005

                                            _____/s/_____
                                                  DORA L. IRIZARRY
                                               United States District Judge

19